[Cite as *Davis v. Royal Paper Stock Co., Inc.*, 2022-Ohio-4135.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLINTON COUNTY

| | | |
|---|---|---|
| JULIE DAVIS, et al., | : | |
| Appellant, | : | CASE NO. CA2021-09-028 |
| | : | O P I N I O N |
| - vs - | | 11/21/2022 |
| | : | |
| THE ROYAL PAPER STOCK CO., INC., et al., | : | |
| | : | |
| Appellees. | : | |

CIVIL APPEAL FROM CLINTON COUNTY COURT OF COMMON PLEAS
Case No. CVH19000202

Davidson Law Offices Co. LPA, and David T. Davidson; Chappars Law Office, and Timothy S. Chappars, for appellant.

Surdyk, Dowd & Turner Co., LPA, and Edward J. Dowd and Christopher T. Herman, for appellees The Royal Paper Stock Company, Inc. and RPS Leasing, Inc.

Lewis, Brisbois, Bisgaard & Smith, LLP, and Joseph Fiorello, for appellee Beauty Systems Group, LLC.

**BYRNE, J.**

{¶1} This case involves a collision between a semi-tractor driven by Shawn Davis and a stationary, docked semi-trailer on a warehouse lot. The collision resulted in Shawn's death. The parties agree that Shawn's own negligence was a proximate cause of the collision and of his death. But Shawn's wife, Julie Davis, and Shawn's estate, filed a lawsuit

alleging that the Defendants' negligence also caused or contributed to Shawn's death. The Defendants moved for summary judgment, which the Clinton County Court of Common Pleas granted. Julie appealed. For the reasons described below, we affirm the trial court's summary judgment decision.

## I. Factual Background and Procedural History

### A. Royal and Beauty's Business Arrangement

{¶2} Defendants, Royal Paper Stock Company, Inc. and RPS Leasing, Inc. (collectively "Royal"), purchase scrap paper and cardboard and sell it to paper mills. Another company and defendant, Beauty Systems Group LLC ("Beauty"), operates a warehouse facility in Greenville, Ohio, which it uses in its business of distributing beauty supplies. Royal and Beauty had an arrangement in which Royal agreed to purchase Beauty's leftover scrap paper and cardboard by the ton.

{¶3} To collect the scrap paper and cardboard, Royal left one of its semi-trailers docked at Beauty's warehouse. Using a forklift, Beauty would load the trailer with scrap paper and cardboard until it was full. Royal would then have the fully loaded trailer transported to its facility. At the same time, Royal would replace the full trailer with an empty trailer so that Beauty could continue loading scrap paper and cardboard. Royal retained R&L Carriers, a freight shipping company, to drop off and pick up Royal's trailers from Beauty's facility.

### B. The Accident

{¶4} On June 20, 2017, Shawn, an R&L Carriers driver, drove to Beauty's warehouse in his semi-tractor to deliver an empty Royal semi-trailer and to pick up Royal's docked semi-trailer ("docked trailer"),[1] which contained approximately 28,000 pounds of

---

1. RPS Leasing, Inc. was the title owner of the trailer and Royal Paper Stock Company, Inc. used the trailer in its business. Both companies are commonly owned.

scrap paper and cardboard.

{¶5}   The undisputed facts show that Shawn's tractor, with the empty semi-trailer still attached, and with the empty trailer's wheels locked (causing 32 feet of skid marks), collided with the nose of the docked trailer.  Shawn's tractor and its empty semi-trailer were positioned perpendicularly to the docked trailer, with the driver side window of the tractor's cab facing towards the nose of the docked trailer.  The impact was a sideswipe.  But somehow, the tractor lifted the front end of the docked trailer up in the air by a few inches, despite the docked trailer being fully loaded.  Sometime during the incident, either before or after the collision, Shawn exited the tractor.  He became pinned between the docked trailer, the door of the tractor, and the tractor's door frame.  At some point, the docked trailer collapsed.  Tragically, Shawn died from the injuries he sustained that day.

{¶6}   There were no witnesses to the collision or to the chain of events that led to Shawn being pinned between the docked trailer and his tractor.  However, several witnesses did see and testified about the immediate aftermath of the collision in discovery depositions. Troy Patterson – another truck driver who was on Beauty's property – testified that he heard a "crash.  A crash, bang."  He then saw that there was a man – Shawn – being crushed between the docked trailer and the door of Shawn's tractor.  Shawn was facing towards the front of the tractor.  Patterson approached, entered the cab through the passenger side, tapped on Shawn's hand, and got no response.  Shawn did not "look good." Patterson decided he needed to free Shawn by backing up the tractor.  At first, he found he could not move the tractor in reverse because the air supply lines between the tractor and the empty trailer were disconnected.  (A semi-trailer's wheels will lock in place if the trailer is not being supplied by air from the semi-tractor.)  Patterson reconnected an air supply line and was then able to reverse the tractor two to three feet.  This action freed Shawn, who then fell to the ground.

{¶7} A second witness, Sherry Waymire, was a Beauty employee. Waymire testified that she was standing in front of the tractor when Patterson was trying to back up the tractor to free Shawn. She watched the tractor "hop" or move *forward* several feet. She described the motion as "like somebody just learning to drive, that hop with the clutch thing." It appeared to her that this forward motion caused the tractor to go "into the trailer * * * even a little bit more." Within a minute, however, Patterson managed to reverse the tractor. Waymire said that when the tractor reversed, Shawn fell to the ground. Waymire testified that the docked trailer remained upright until the tractor backed up. Immediately after the tractor backed up, Waymire observed the docked trailer collapse to the ground.

{¶8} A third witness, Randy Gunkle, testified that he also saw the aftermath of the accident. When he saw Shawn pinned, the docked trailer had not yet collapsed. Like Waymire, Gunkle testified that the docked trailer collapsed either immediately after or shortly after the tractor reversed.

{¶9} Photographs submitted with summary judgment filings show damage to the tractor's driver's-side mirror and door, as well as damage to the fender above the driver's-side wheel and tire.

{¶10} The docked trailer had "landing gear" or "landing legs," which were structural legs located towards the nose of the docked trailer that could be lowered to support the docked trailer when it was unhooked from a tractor. The legs were lowered and supporting the docked trailer before the collision. When the docked trailer collapsed, the landing gear legs both fell to the ground.

{¶11} A police detective who investigated the accident believed that Shawn may have been outside of the tractor, unhooking the empty trailer, when the tractor started moving forward on its own, perhaps because Shawn left the tractor in gear. The detective surmised that Shawn then tried to board the moving tractor to stop it when the impact with

the docked trailer occurred, pinning him between the cab door and the door frame.

### C. The Complaint

{¶12} In 2019, Julie Davis, individually and as the administrator of Shawn's estate, filed a complaint against Royal and Beauty. Julie alleged that the docked trailer's landing gear were "rusted, weakened, and in a state of disrepair susceptible to collapse." Julie alleged that the trailer's landing gear collapsed after Shawn's tractor "grazed" the docked trailer, pinning Shawn between the driver's door and driver's side of the cab of the tractor.

{¶13} Julie alleged that Royal, as the owner of the docked trailer, breached a duty of care to Shawn to keep the docked trailer in a reasonably safe condition and was negligent by failing to adequately inspect, maintain, and repair the docked trailer. Julie also alleged that Beauty owed Shawn a duty to keep its warehouse in a reasonably safe condition and to warn of hidden dangers. The complaint alleged that Beauty knew that the docked trailer presented a dangerous condition and was negligent by allowing the docked trailer to be present at the warehouse and by not warning others of the dangerous condition.

### D. Expert Witnesses

{¶14} The parties engaged in extensive discovery, including deposing the witnesses described above, along with others. In addition to these lay witnesses, three expert witnesses—two retained by Julie and one retained by Beauty—provided written reports and were deposed. Because the issues in this appeal largely concern the expert witnesses, we will summarize their written reports and deposition testimony here.

### 1. Dr. Mariusz Ziejewski, Ph.D.

{¶15} Julie retained Dr. Mariusz Ziejewski, a mechanical engineer with a Ph.D. in high viscosity flow dynamics (fluid analysis), to offer his opinion about the causes of the accident.

**a. Dr. Ziejewski's Written Report**

{¶16} Dr. Ziejewski issued a written report in which he summarized his investigation and conclusions. Dr. Ziejewski wrote that he reviewed various written material associated with the accident, including the police report and an investigation by the Occupational Safety and Health Administration ("OSHA"). He also reviewed the deposition testimony of multiple witnesses to the accident. Finally, he physically examined the accident site, the docked trailer, and the collapsed landing legs. He reviewed various photographs of the damage to the tractor.

{¶17} Dr. Ziejewski offered his opinion about the sequence of events. Dr. Ziejewski believed that Shawn was unhooking his empty trailer and in doing so attempted to disconnect the trailer's king pin from the tractor. But, unbeknownst to Shawn, the king pin re-engaged, and the empty trailer was not decoupled when Shawn got back into the tractor and began moving the tractor.[2] Shawn then began dragging the trailer with its wheels locked, which was evident because there were around 32 feet of drag marks behind the empty trailer leading up to the collision site.

{¶18} Dr. Ziejewski further believed that the first interaction between the tractor and docked trailer was that the tractor's left front fender "interacted with the underside of the docked trailer resulting in the left front fender being brought in contact with the left front wheel." This occurred while Shawn was still in the tractor. While he did not specify it in his written report, Dr. Ziejewski later clarified at his deposition that this "interaction" resulted in the docked trailer being lifted and effectively perched and balanced like a "teeter totter" on the tractor's left front fender/wheel.

{¶19} Following this event, Dr. Ziejewski believed that Shawn exited the cab. Due

---

2. There was evidence in the summary judgment record to establish that king pin re-engagement after disconnection was not an unusual occurrence in commercial trucking.

to his weight (454 pounds), Shawn contributed to the "counterclockwise roll of the cab." The docked trailer then slipped off the left front fender/wheel and collapsed onto the tractor as Shawn was exiting the tractor.

{¶20} Dr. Ziejewski stated that the "biomechanical analysis of the event are consistent with the trailer collapsing and pinning [Shawn] between the driver's door and the frame of the cab, followed by release and subsequent head strike into the pavement." Ultimately, Dr. Ziejewski stated that "[t]he trailer fell due to the failure of the supporting legs, not as a result of contact with the tractor."

### b. Dr. Ziejewski's Deposition

{¶21} At his deposition, Dr. Ziejewski admitted that he did not perform any failure testing on the landing legs and did not determine why the legs failed. He also did not perform any testing to determine the level of corrosion of the legs. He did not determine whether the condition of the landing legs violated any applicable standards.

{¶22} Dr. Ziejewski explained that he had some expertise in metallurgy and had experience in failure analysis of metals but had not found it necessary to conduct any tests. He also said that he could have x-rayed the legs to determine how much metal there was as opposed to rust and that "we do it on a regular basis."

{¶23} Dr. Ziejewski did not consider the weight or distribution of the scrap paper and cardboard in the tractor in his analysis. According to Dr. Ziejewski, the weight and distribution of the materials in the trailer did not affect his opinion because he "simply accepts the fact that the legs didn't maintain the upright position of the trailer."

{¶24} Dr. Ziejewski confirmed that he performed no calculations to determine the forces between the tractor and docked trailer. He admitted that he could not say whether a new trailer would have collapsed under the same circumstances because he could not perform those calculations without knowing the weight distribution of the contents of the

docked trailer. He also did not know the specification of lateral forces that the docked trailer was designed to withstand. He could not testify that the landing legs did not follow their designed characteristics.

{¶25} During his deposition, Dr. Ziejewski expanded upon what he believed happened before and after the crash. He believed that Shawn was probably surprised that the king pin had not disengaged and opened the door of his tractor and was looking around, asking "what happened" when the tractor impacted the docked trailer.

{¶26} Dr. Ziejewski believed that when the impact occurred, the trailer was lifted around two to four inches off the ground and was resting on the tractor's fender/wheel and was angled to the west. Dr. Ziejewski believed that one of the landing gear legs was on the ground and one was off the ground, though there was no explanation at his deposition for how he made this determination. Dr. Ziejewski stated that when Shawn exited the tractor, a shift in weight in a westerly direction occurred, causing the docked trailer to slide off its "perch" on the tractor's fender. The docked trailer then dropped 2-4 inches, the legs collapsed, and Shawn was pinned.

{¶27} Dr. Ziejewski noted photographs of the tractor's driver door that showed marks or scratches that were horizontal and then angled downwards at ten degrees. He testified that this change in angle of the scratches or marks showed the landing gear legs collapsing.

{¶28} Dr. Ziejewski's opinion was that what occurred was a minor "side-swipe" accident coupled with a ten-degree tilting of the docked trailer. Dr. Ziejewski believed that what occurred was so minor that it should not have resulted in the landing gear collapsing.

{¶29} When asked whether, if the docked trailer had been empty, it would have changed his analysis, Dr. Ziejewski responded, "No. I am basing my analysis on that scratch pattern that we discussed. That's all." When asked if it was his opinion then that the trailer would have collapsed even had it been empty, Dr. Ziejewski clarified that he did not know

if an empty trailer would have collapsed or not. He then admitted that weight and distribution of the docked trailer was a relevant factor, but that he did not know that information and referred to his earlier testimony in which he had repeatedly said he could not perform various force calculations without knowing the weight distribution of the trailer.

{¶30} As to how he arrived at the opinion in his written report that "[t]he trailer fell due to the failure of the supporting legs, not as a result of contact with the tractor," Dr. Ziejewski explained that if the trailer had collapsed towards the east (the direction that the tractor was moving at impact), then his opinion would be that the collision with the tractor caused the legs to collapse. But it "[w]ent to the west, and ten-degree tilt, this was enough."[3]

### 2. Timothy Bussard

{¶31} Julie also retained Timothy Bussard, a commercial transportation specialist who worked at a forensic consulting firm. Bussard had once been a commercial truck driver and the director of safety at several trucking companies.

### a. Bussard's Written Report

{¶32} Bussard issued a written report that described his investigation and opinions on whether the actions or inactions of Beauty or Royal caused or contributed to Shawn's injuries and death. He wrote that he inspected the docked trailer, and specifically the undercarriage area around the landing legs and found that it was "severely rusted and had not been maintained" by Royal. Bussard further wrote that Beauty had created an unsafe condition by allowing Royal to bring and leave a "dangerously defective trailer" on its property.

{¶33} Bussard further believed that Beauty had failed to follow OSHA regulations as

---

3. The record is not entirely clear on what Dr. Ziejewski meant about the trailer collapsing towards the east or west. We believe that this refers to the direction the trailer collapsed relative to the landing gear. That is, if the trailer had collapsed towards the east, the landing gear would have oriented to the west, and vice versa. The landing gear collapsed towards the east, and thus the trailer fell in the opposite westerly direction.

well as nationally recognized standards of care related to its failure to use trailer jack stands, which are portable jacks that can be placed underneath a parked trailer as another support structure. Bussard wrote that if Beauty had placed a trailer jack stand underneath the docked trailer, this "may have prevented the trailer collapse upon being struck." Bussard wrote that Beauty's failure to use a jack stand was a contributing cause that led to the incident.

### b. Bussard's Deposition Testimony

{¶34} At his deposition, Bussard testified that he was not trained or certified in accident reconstruction, metallurgy, on the effects of corrosion on the thickness or integrity of steel or other metals and had no training in why steel components may fail. He added that he did not know of any industry or manufacturing standards for lateral movement that landing gear should be able to absorb. Bussard agreed that rust on a trailer is not unusual, and he was unfamiliar with any guides or publications that would specify when landing gear must be replaced or serviced due to corrosion. He did not know how much steel thickness had been lost to corrosion on the docked trailer.

{¶35} Bussard clarified that he was *not* offering an opinion that the rust that he observed on the underside of the trailer negatively affected the trailer's structural integrity. He believed that scientific testing was available that could determine the structural integrity of the trailer.

{¶36} Bussard believed that a new trailer's landing legs would not have buckled under the same circumstances. His opinion was based on the condition of the undercarriage and his review of the docked trailer's maintenance records. He also offered that "these trailers are normally solid" and that the landing legs are "solid enough to withhold a large impact, a lot of damage." He later added that in his experience, trailers have been dropped "in a higher fashion than 4 inches."

{¶37} Bussard did not know when the landing gear collapsed during the incident and did not know what forces caused the landing gear to collapse. He agreed that the primary purpose of landing gear was to support a trailer when in its parked position. Bussard agreed that the trailer was loaded with 28,000 pound of scrap paper and cardboard and that the legs had functioned properly while it was being loaded with that material. He also agreed that the only factor that changed was Shawn's tractor striking the trailer and then the tractor backing off it.

{¶38} Bussard conceded that Royal had inspected the docked trailer within the previous 12 months and had complied with applicable Federal Motor Carrier Safety Administration ("FMCSA") regulations.

{¶39} As for Beauty, Bussard stated that there were no FMCSA regulations imposing an obligation to use jack stands. He also admitted that OSHA only *recommended* jack stands, and that there no standards *requiring* their use. That said, he was critical of Beauty for failing to use jack stands.

{¶40} Bussard stated that he had conducted no experiments involving crashing a tractor into a docked trailer with a jack stand underneath it and agreed that there was no way to know what would have happened had there been a jack stand underneath the docked trailer.

{¶41} When asked to clarify what he believed to be the defect in the docked trailer, Bussard stated that "it *could* have been the landing legs were not sufficient." (Emphasis added.)

### 3. Dr. Ashley Dunn, Ph.D.

{¶42} Beauty retained Ashley Dunn, Ph.D., a mechanical engineer, to investigate the accident.

**a. Dr. Dunn's Written Report**

{¶43} In his report, Dr. Dunn wrote that Shawn drove his tractor into the docked trailer while trying to disconnect his semi-trailer. Dr. Dunn believed that the docked trailer maintained an upright position until Patterson reversed the tractor. The eventual collapse of the docked trailer's landing gear resulted from the reversing of the tractor, which imparted a horizontal force high above the ground. That lateral force, in turn, generated a "moment" sufficient to overload the legs of the landing gear.

{¶44} Whether or not Shawn drove his tractor into the docked trailer, or the tractor rolled into the docked trailer, Dr. Dunn wrote that the docked trailer and its landing gear did not cause the accident or contribute to the accident. Nor did the collapse of the docked trailer cause or contribute to Shawn's injuries. The docked trailer successfully supported being loaded with about 28,000 pounds of scrap paper/cardboard. Therefore, Dr. Dunn believed that the legs were functioning properly and as designed before the tractor hit the docked trailer.

{¶45} As for Dr. Ziejewski's report and deposition testimony, Dr. Dunn believed that Shawn exiting the tractor cab would not have deflected the tractor's suspension significantly. If Shawn was exiting the cab at the time of the accident, his movement onto the steps did not put any new weight on the tractor or cause it to disengage from the docked trailer. Dr. Dunn believed that Dr. Ziejewski trivialized the collision forces between the moving tractor (weighing around 34,000 pounds) and the docked trailer (with an approximate weight of 40,000 to 50,000 pounds). Dr. Dunn contended that the structure of the docked trailer, including landing gear legs, was not designed or intended to remain intact following a vehicle crash.

{¶46} Dr. Dunn believed that it was speculative to say that the initial impact of the tractor into the docked trailer resulted in the docked trailer being lifted enough to perch atop

the left-front fender and steer-axle tire of the tractor. He believed that the left-front fender and steer-axle tire would not support one end of the partially loaded docked trailer. Dr. Dunn wrote that Dr. Ziejewski provided no scientific evidence, testing, modeling, or other analysis that provided any support for his opinion that the docked trailer collapse did not result from the contact with the tractor.

{¶47} As for Bussard's opinions, Dr. Dunn stated that because of the lateral forces imparted upon the docked trailer during the collision and subsequent reversing of the tractor, it was speculative to conclude that portable trailer jacks would have prevented the collapse of the docked trailer.

### b. Dr. Dunn's Deposition Testimony

{¶48} At his deposition, Dr. Dunn testified as to his belief regarding the chain of events. He, like Dr. Ziejewski, agreed that it was more likely that Shawn drove the tractor into the docked trailer. He found this more likely than the investigating detective's theory that the tractor rolled into the docked trailer on its own because it would have required power to move the empty trailer. He believed that after impacting the docked trailer, Shawn probably attempted to back his tractor up, just enough so that he could exit the cab and get partially out of the door. Then, Dr. Dunn believed, the tractor lurched forward on its own, crushing Shawn between the door and the cab. Dr. Dunn explained that if Shawn had left the tractor in reverse after backing up, then removed himself from the tractor controls, the clutch may have disengaged itself and allowed the truck to roll forward.

{¶49} As to why he did not believe that Shawn's weight was significant in terms of him getting out of the tractor cab, Dr. Dunn explained that the suspension system of this tractor was statically and dynamically designed to support 50,000 pounds. Thus, Shawn's weight of 400-plus pounds was not a significant addition to that suspension. But most importantly, Shawn's weight was not an added factor to the suspension.

**E. Summary Judgment Motions and Trial Court Decision**

{¶50} In March 2021, Royal and Beauty each moved for summary judgment, which they supported with the filing of various depositions and other evidence. After the summary judgment motions were fully briefed, the trial court issued a decision granting summary judgment in favor of Beauty and Royal.

{¶51} The trial court found that the summary judgment evidence showed that the proximate cause of Shawn's injuries and death was the lateral collision between Shawn's tractor and the docked trailer, and that the rust on the docked trailer's landing gear was *not* an additional proximate cause of Shawn's injuries and death.

{¶52} In reaching this conclusion, the trial court found that Julie had submitted no evidence establishing that the rust on the docked trailer's landing gear was the proximate cause of Shawn's injuries and death. The court observed that neither Dr. Ziejewski nor Bussard performed any testing on the landing gear's structural integrity. The trial court concluded that "without [such] tests and expert testimony it is impossible to conclude that the amount of rust on the legs of this [docked] trailer was the proximate cause of the accident." The court noted that Bussard stated that it "could have been" possible that the accident was caused because the landing gear "were not sufficient." The court found this testimony not sufficiently definitive.

{¶53} As for the existence of a duty of care, the trial court further found that it was not foreseeable that the stationary docked trailer would cause injuries or death and thus neither Beauty nor Royal owed Shawn a duty to warn him.

{¶54} Finally, the court held that "even if the Defendants were negligent, which the Court concludes they were not, the negligence of [Shawn] clearly exceeded it, and therefore, bars recovery."

{¶55} Julie appealed, raising two assignments of error.

## II. Law and Analysis

{¶56} This court reviews a trial court's summary judgment decision under a de novo standard. *Deutsche Bank Natl. Trust Co. v. Sexton*, 12th Dist. Butler No. CA2009-11-288, 2010-Ohio-4802, ¶ 7. Summary judgment is appropriate under Civ.R. 56 when (1) there is no genuine issue of material fact remaining to be litigated, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party, who is entitled to have the evidence construed most strongly in her favor. *BAC Home Loans Servicing, L.P. v. Kolenich*, 194 Ohio App.3d 777, 2011-Ohio-3345, ¶ 17, (12th Dist.), citing *Zivich v. Mentor Soccer Club, Inc.*, 82 Ohio St.3d 367, 369-370 (1998).

{¶57} The party requesting summary judgment bears the initial burden of informing the court of the basis for the motion and identifying those portions of the record that show the absence of a genuine issue of material fact. *Dresher v. Burt*, 75 Ohio St.3d 280, 292-293 (1996). Once a party moving for summary judgment has satisfied its initial burden, the nonmoving party "must then rebut the moving party's evidence with specific facts showing the existence of a genuine triable issue; it may not rest on the mere allegations or denials in its pleadings." *Sexton* at ¶ 7; Civ.R. 56(E).

## A. Assignment of Error No. 1

{¶58} Julie's Assignment of Error No. 1 states:

{¶59} THE TRIAL COURT ERRED IN CONCLUDING THAT THE SOLE PROXIMATE CAUSE OF MR. DAVIS' DEATH WAS THE INITIAL SIDESWIPE COLLISION, RATHER THAN CONCLUDING THAT A JURY QUESTION EXISTED AS TO WHETHER DEFENDANTS' ACTIONS AND INACTIONS WERE CONCURRENT PROXIMATE CAUSES TO THE EVENTUAL COLLAPSE OF THE TRAILER THAT PINNED SHAWN P. DAVIS.

{¶60} Julie argues that the trial court erred in granting Royal's and Beauty's motions for summary judgment. In Assignment of Error No. 1, Julie argues that the trial court erred in its determination that Shawn's action of crashing into the docked trailer was the sole proximate cause of his injuries and death. Julie does not dispute that Shawn caused the accident that led to his injuries and death. Rather than disputing that Shawn's actions caused the accident, she contends that the trial court failed to consider her expert's opinions that the docked trailer's landing legs were — because of rust — defective and were an additional proximate cause of Shawn's injuries and death.

{¶61} "In order to establish an actionable negligence claim, a plaintiff must establish that (1) the defendant owed [the] plaintiff a duty, (2) the defendant breached that duty, and (3) the defendant's breach proximately caused the plaintiff's injuries." *Perelman v. Meade*, 12th Dist. Warren No. CA2021-06-054, 2021-Ohio-4247, ¶ 15.

{¶62} "'"The proximate cause of an event is that which in a natural and continuous sequence, unbroken by any new, independent cause, produces that event and without which, that event would not have occurred."'"[4] *Towles v. MillerCoors, LLC*, 12th Dist. Butler No. CA2019-12-207, 2021-Ohio-34, ¶ 20, quoting *Valentine v. PPG Industries, Inc.*, 158 Ohio App. 3d 615, 2004-Ohio-4521, ¶ 16 (4th Dist.), in turn quoting *Aiken v. Indus. Comm.*, 143 Ohio St. 113, 117 (1944). "Proximate cause 'contemplates a "probable" or "likely" result, not merely a "possible" one,' and therefore, the issue of proximate cause is not subject to speculation or conjecture." *Orren v. BWF Corp.*, 12th Dist. Warren No. CA2013-11-112, 2015-Ohio-62, ¶ 16, quoting *Morgan v. Ramby*, 12th Dist. Warren Nos. CA2010-10-095 and CA2010-10-101, 2012-Ohio-763, ¶ 25.

{¶63} Here, Royal and Beauty satisfied their initial burden in summary judgment

---

4. We address duty and breach of duty in the second assignment of error.

proceedings by submitting summary judgment evidence, including expert depositions and layperson depositions demonstrating that Shawn's injuries and death were caused by his own actions and that Julie had offered only speculation, not summary judgment evidence, regarding her theory that the docked trailer's landing legs collapsed because of rust. Remember, Julie does not dispute that Shawn caused the accident that led to his injuries and death. Julie instead, relying on her experts' testimony, argues that she met her reciprocal burden under Civ.R. 56(E) to demonstrate a genuine issue of fact on causation. That is, Julie argues that she produced evidence of a different proximate cause for Shawn's injuries, i.e., that the docked trailer's landing legs were "severely rusted and corroded," and that the landing legs collapsed "because they lacked adequate structural integrity." Julie attempts to rebut Royal and Beauty's summary judgment argument by arguing that, given her experts' testimony about the inadequate structural integrity of the landing legs, there are genuine issues of material fact related to proximate cause that should have prevented the trial court from awarding summary judgment to Royal and Beauty. If Julie's experts had testified in such a way that there were genuine disputes over material fact, we would agree. But we have thoroughly reviewed Dr. Ziejewski's report and deposition testimony and Bussard's report and deposition testimony, and we find that they do not, in fact, create genuine issues of material fact barring summary judgment.

{¶64} We first turn to Dr. Ziejewski's written report and testimony. Dr. Ziejewski testified that factors like the weight and distribution of scrap paper and cardboard in the trailer were "relevant" to the trailer's collapse. Despite this acknowledgment of the factors at play, Dr. Ziejewski testified that the speed of the tractor when it hit the docked trailer, the weight of the docked trailer, the kind of forces at play during the collision, the weight of the paper material in the docked trailer and its distribution in the trailer, and the amount of force applied to the west leg of the trailer at the moment it collapsed were all irrelevant to his

analysis. He explained that this information was unimportant because he "simply accept[ed] the fact that the legs didn't maintain the upright position of the trailer." What is more, Dr. Ziejewski admitted that it really did not matter to his analysis, one way or the other, whether there was any problem with the landing legs:

> Defense counsel: Would the weight or distribution have any impact on your opinion?
>
> Dr. Ziejewski: No. Because my opinion simply accepts the fact that the legs didn't maintain the upright position of the trailer. *So whether or not there's something wrong with the leg*, or weight distribution was wrong, or too much weight, or one side versus another, *this is not of relevance to me.* What's of relevance to me is relatively mild contact, sideswiped contact, and probably some lifting, a little bit of the trailer, resulted in that collapse.

(Emphasis added.) Consistent with Dr. Ziejewski's admission that it was irrelevant to his analysis "whether or not there's something wrong with the leg," he admitted more than once during his deposition that he performed no investigation at all in order to determine the structural integrity of the landing legs or the reason the legs collapsed.[5] For example:

> Defense counsel: Okay. Did you attempt to ascertain the reason why the undercarriage or the landing gear failed on the date of this accident??
>
> Dr. Ziejewski: No, not why. It simply did fail, but the reason for it, no.

{¶65} Dr. Ziejewski acknowledged that he could have performed scientific failure testing on the landing legs and could have performed corrosion testing to determine the effects of rust corrosion on the landing legs. He simply chose not to. He explained this choice when he testified that when he was retained for this litigation, he was not asked to

---

5. Dr. Ziejewski also admitted that he performed no scientific analysis of the lateral forces at play when the approximate 34,000-pound tractor impacted the docked trailer. This, as he explained repeatedly during his deposition, was because he did not know the weight distribution of the docked trailer.

- 18 -

assess the docked trailer's structural integrity:

> Defense counsel: Okay.  And again, you likewise were not asked to evaluate the structural integrity of the [docked trailer], correct?
>
> Dr. Ziejewski: Correct.

**{¶66}** When defense counsel asked Dr. Ziejewski whether the result of the collision would have been different if the docked trailer were replaced with a new trailer—that is, one in which there was no rust or corrosion on the landing legs—he testified that he did not know.  More specifically, Dr. Ziejewski stated that it was "possible" that the same type of collapse would have occurred with a new trailer, but he "personally" did not think the new trailer would collapse.  Dr. Ziejewski not only admitted that he did not conduct any analysis to determine whether the result of the collision would have been different if the docked trailer were replaced with a new trailer without rust, but he also testified that there was no way to do this analysis because he lacked the necessary information about weight distribution within the docked trailer:

> Defense counsel: But you can't tell me [the docked trailer] collapsed where a new truck trailer wouldn't have collapsed under the same circumstances because these legs, for instance, 10 percent weaker than brand-new legs, correct?
>
> Dr. Ziejewski: Well, I cannot do this calculations [sic] by not knowing the weight distribution.  You will be making a bunch of assumptions, which doesn't lead to anything. In other words, in this situation, you cannot perform those kind of calculations. They won't be reliable.
>
> Defense counsel: And that's what I'm getting at. There's no reliable scientific study you can point me to that says, this trailer collapsed where another one wouldn't have based on these legs?
>
> Dr. Ziejewski: I don't know how to answer your question. Again, I just expressed my opinion on that topic a number of times, and I have nothing more to add.

**{¶67}** Dr. Ziejewski also testified that the force with which Shawn's tractor struck the

docked trailer was a "minor interaction." But he said it was unnecessary to perform any calculations to determine that the force was minor because he determined that the scrapes and other damage on the trailer showed that the force was minimal. He also did not know how many hundreds of pounds of force would be needed to break the tractor's fiberglass fender, but he believed that "not much" force was needed.

{¶68} Dr. Ziejewski's written opinion concluded that the docked trailer collapsed due to the "failure" of the landing legs. Dr. Ziejewski's testimony establishes that he did not attempt to calculate the forces involved or whether the rust on the landing legs decreased the structural integrity of the legs because his analysis simply *presumed* that the landing gear were defective. In other words, Julie asks us to find that a genuine issue of material fact exists based solely on Dr. Ziejewski's presumption. This cannot avoid summary judgment, for reasons we will further explain below.

{¶69} We next turn to Bussard's written report and deposition testimony. Bussard maintained that the docked trailer's landing legs were not properly maintained, and that if they had been properly maintained then Shawn would not have died. That said, despite blaming Shawn's death on the landing legs, Bussard admitted that he had no opinion on whether the corrosion or rust on the landing legs had negatively impacted the structural integrity of the legs. He admitted that an analysis of the legs' structural integrity was "beyond my scope." He also admitted that the fact the legs collapsed did not signal Royal or Beauty had violated any rules related to the legs.

{¶70} Bussard admitted that it is "not unusual" for rust to form on a trailer's undercarriage and legs, and in fact it should be expected. Bussard also stated that while he viewed the rust on the docked trailer's undercarriage and legs as extensive, this was his own subjective, non-scientific opinion. Bussard admitted that he did not know how much of the landing legs' metal was lost to rust, and that he was not offering any opinion that the

rust appearing on the trailer negatively impacted the trailer's structural integrity. Finally, Bussard was unable to identify any actual defect in the trailer or its landing gear; he simply stated that it "*could* have been the landing legs were not sufficient" to prevent the trailer's collapse. (Emphasis added.) In other words, Bussard only offered a possibility.

{¶71} Bussard offered generic testimony that he was aware of other trailers that had not collapsed after being dropped from greater heights than four inches or that had not collapsed after being impacted by tractors. He also stated his belief that a new trailer would not have collapsed in the same situation. But Bussard offered only generic, non-specific descriptions of other trailer collision incidents—descriptions having so little detail they do not even rise to the level of "anecdotes"—in support of this belief, and Bussard admitted that he had never seen a collision situation involving a "similar scenario" as that in this case. Bussard's testimony was essentially an invitation to speculate that the landing gear of the docked trailer must have been defective.

{¶72} When examining Dr. Ziejewski's and Bussard's written reports and testimony in a light most favorable to Julie, her experts offered nothing more than speculation to support their positions that the docked trailer's landing legs were deficient as a result of rust corrosion. Mere speculation cannot create a genuine issue of material fact. *See Holbrook v. Kingsgate Condominium Assn.*, 12th Dist. Butler No. CA2009-07-193, 2010-Ohio-850, ¶ 27, citing *Schutt v. Rudolph-Libbe, Inc.*, 6th Dist. Wood No. WD-94-064, 1995 WL 136777, *6 (Mar. 31, 1995) (finding expert testimony too speculative to create a genuine issue of fact and noting that summary judgment on proximate cause is appropriate where evidence of causation is so meager and inconclusive that a finding of proximate cause would rest on speculation and conjecture); *Gouhin v. Giant Eagle*, 10th Dist. Franklin No. 07AP-548, 2008-Ohio-766, ¶ 12 (holding that despite export report, the court would have to rely on speculation and inference stacking to find a genuine issue of fact). In addition, unsupported

factual assertions and anecdotal allegations are insufficient to create genuine issues of fact. *Adkins v. Yamaha Motor Corp., U.S.A.*, 4th Dist. Lawrence No. 14CA2, 2014-Ohio-3747, ¶ 17; *DiPenti v. Park Towers Condominium Assn.*, 10th Dist. Franklin No. 19AP-384, 2020-Ohio-4277, ¶ 25.

{¶73} These principles are well established, and we have applied them to expert testimony in summary judgment cases many times. *See Clarkwestern Dietrich Bldg. Sys., L.L.C. v. Certified Steel Stud Assn., Inc.*, 12th Dist. Butler No. CA2016-05-098, 2017-Ohio-1091, ¶ 30 (affirming summary judgment when expert's testimony was speculative and did not raise genuine issues of material fact); *State Farm Fire & Cas. Co. v. Holland*, 12th Dist. Madison No. CA2007-08-025, 2008-Ohio-4436, ¶ 24-29 (affirming summary judgment to defendant when plaintiff's experts testified about origin and cause of fire but relied on assumptions not supported by the evidence, and noting that "a trial court may find an expert's opinion unreliable where the expert lacks all of the necessary facts prior to formulating his opinion"); *Fink v. J-II Homes, Inc.*, 12th Dist. Butler No. CA2005-01-021, 2006-Ohio-3083, ¶ 30-31 (affirming summary judgment to defendant when plaintiff's expert did not give the cause of the breakage of a window, and instead offered possible causes for the breakage, and noting speculation as to causation "is not permitted in the law"); *Millard v. Sisters of Mercy*, 12th Dist. Butler No. CA98-10-216, 1999 WL 296754, *2 (May 10, 1999) (where plaintiff alleged that defendant negligently applied sealer to driveway and failed to inspect the premises, we affirmed summary judgment to defendant, in part because the expert's testimony was based on impermissible speculation and conjecture when expert offered only theoretical explanations and conclusive statements); *Goens v. Torco Cos.*, 12th Dist. Butler No. CA89-06-092, 1990 WL 4259, *5 (Jan. 22, 1990) (affirming summary judgment on plaintiff's negligence claim, which was based on a claim of negligent inspection, when expert "could not say with certainty whether termites were present at the

time of sale" and plaintiff relied on "speculation and conjecture" that because termites were present in 1987, they must have been present in 1982); *Commercial Union Ins. Cos. v. GE*, 12th Dist. Clermont No. CA86-01-009, 1986 WL 7984, *2 (July 21, 1986) (affirming summary judgment to defendant when plaintiff relied on speculation, without evidence to support contention that fryer was cause of fire). As a result, we find that Royal and Beauty satisfied their initial burden in summary judgment proceedings by showing that there is no disputed issue of material fact. Meanwhile, Julie failed to satisfy her reciprocal burden under Civ.R. 56(E) to demonstrate a genuine issue of material fact as to causation. There is no genuine issue of material fact with regard to the proximate cause element of Julie's negligence claims, and the trial court properly granted Royal and Beauty's motions for summary judgment.

**{¶74}** Julie makes a few additional arguments about proximate cause that we will briefly address. First, Julie argues that the trial court ignored a genuine issue of fact on whether the impact was "significant" or "minor." She points to the opinions of Dr. Ziejewski, who characterized the impact as "minor" and Dr. Dunn, who contended that semi-trailer landing gear were not designed to withstand a "significant" impact. The severity of the crash is ultimately irrelevant. Once Royal and Beauty met their summary judgment burden of demonstrating that Shawn proximately caused his own death and that there are no genuine issues of material fact with respect to causation, it was incumbent upon Julie to produce evidence to show a genuine issue of fact as to whether the trailer was in a defective condition and that the defective condition caused or at least contributed to the collapse. *Sexton*, 2010-Ohio-4802 at ¶ 7. As explained above, she did not do so.

**{¶75}** Next, Julie cites *Young v. Clark*, 8 Ohio L. Abs. 172, 2d Dist. Franklin No. 1774, 1929 WL 2306 (Nov. 8, 1929), which she argues presents a similar case and required the trial court to deny summary judgment. In *Young*, the defendant parked his vehicle and

set the emergency parking brake before leaving the vehicle. *Id.* at *1. The vehicle was subsequently "dislodged" from its parking space by the removal of a Ford parked next to it, or when it was bumped by a Buick. As a result, the vehicle ran down a sharp grade on its own momentum and struck and injured the plaintiff. After a trial, the jury found that the emergency brake was not in proper repair and had it been, it would have held the vehicle in place. *Id.*

{¶76} The appeals court found that from these facts, it was permissible and logical for the jury to conclude that the defendant was negligent in parking his vehicle with inefficient brakes and that in the exercise of ordinary care, he should have known that such a vehicle could be released from its position and proximately result in an injury to someone. *Id.* The court observed that the "brake would not and did not accomplish the result which it was designed to effect" and that it was a jury question to determine whether in the exercise of ordinary care the defendant should have anticipated that the accident could occur. *Id.* at *2. The court also rejected the defendant's argument that it was the Buick driver's actions that were the proximate cause of the accident. The court noted that there can be more than one proximate cause of an accident, and the act of the Buick driver and the failure to have effective brakes were both proximate causes of the accident. *Id.*

{¶77} Julie argues that like the brakes in *Young*, the landing legs in this case did not accomplish the result which they were designed to effect because "the structurally defective and corroded undercarriage and dolly legs did not support a mere 2-4 inch vertical drop when the tractor-trailer shifted resulting in a complete collapse." Thus, Julie argues that Royal's and Beauty's negligence partially contributed to the accident as concurrent proximate causes.

{¶78} We do not find *Young* on point. *Young* was not a summary judgment case. In *Young* the jury found that the brakes were ineffective. Here, however, and as described

above, Royal and Beauty provided evidence establishing that there was no genuine issue of material fact with regard to Shawn causing the accident nor with regard to the rusty landing legs, and Julie did not present evidence that the rust on the undercarriage and legs rendered the landing legs defective. Julie's experts offered only presumptions and speculation regarding the landing legs and their level of corrosion, not specific facts demonstrating a genuine issue of fact as to a defective condition. *Sexton*, 2010-Ohio-4802 at ¶ 7.

{¶79} Finally, Julie notes that Bussard contended that Beauty's failure to use jack stands was a contributing cause to Shawn's injuries. But again, Bussard was not an accident reconstructionist, and he testified that there was no way to determine what would have happened had jack stands been in place. Bussard also admitted during his deposition that there were no regulations or standards requiring the use of jack stands. Therefore, Bussard's suggestion about jack stands is only speculative and does not create any genuine issue of material fact.

{¶80} Having reviewed all the summary judgment evidence, including the reports and testimonies of Dr. Ziejewski and Bussard, we find that Royal and Beauty have demonstrated the absence of a genuine issue of material fact as to proximate cause, while Julie has not presented specific facts showing the existence of a genuine issue of material fact as to proximate cause. Neither Dr. Ziejewski nor Bussard undertook any investigation into the structural integrity of the landing legs. And there was no other evidence put forth that would establish that the trailer was defective and that the collapse was potentially due, at least in part, to the rust and potential corrosion on the docked trailer's landing legs, rather than solely caused by the horizontal impact with the tractor and Shawn's negligence. Without such evidence or testimony, the trial court correctly concluded there was no genuine issue of material fact, and that the sole proximate cause of Shawn's injury and

death was his own negligence. *Reed v. Weber*, 83 Ohio App.3d 437, 442 (1st Dist.1992) (holding that the issue of proximate cause may be determined in summary judgment proceedings as a matter of law if the summary judgment record demonstrates no genuine issue of material fact that remains to be litigated). *See Ornella v. Robertson*, 14 Ohio St.2d 144, 151 (1968); *Reese v. Minor*, 2 Ohio App.3d 440, 441 (1st Dist.1981); *Zawlocki v. Houtz*, 40 Ohio App.2d 118, 123-124 (3d Dist.1974).

{¶81} The dissent argues that we have weighed the evidence, evaluated the relative credibility of Dr. Ziejewski and Bussard as opposed to Dr. Dunn, and improperly decided the question of proximate cause, which should be left to the jury. We agree that proximate cause is normally an issue for the finder of fact to decide, but we disagree with the remainder of the dissent's characterization of our analysis. As explained above, we simply find that Royal and Beauty presented evidence demonstrating the absence of a genuine issue of material fact and that Julie has not pointed to any evidence creating a genuine issue of material fact with regard to proximate cause. Julie points to the testimony of Dr. Ziejewski and Bussard with respect to the landing legs, but as we have explained they offer only speculation regarding the condition of the landing legs. Such speculative testimony is not evidence creating a genuine issue of material fact, and an appellate court may determine the issue of proximate cause in the summary judgment context when there is no genuine issue of material fact. ¶ 72 above (citing cases).

{¶82} Finally, the dissent focuses on Dr. Dunn's testimony, and faults us for believing Dr. Dunn while not believing the other two experts. In fact, we make only one brief reference to Dr. Dunn in our analysis above, and only then in the context of describing one of Julie's arguments and concluding that that argument was irrelevant. ¶ 74 above. The dissent further argues that there is a genuine issue of material fact because Dr. Dunn opined that the docked trailer was not lifted in the air, but rather the tractor lurched forward

on its own volition, causing the docked trailer to collapse. But while there may be testimony supporting competing theories about the precise sequence of events leading to Shawn's death, we are not called on in this case to decide the precise sequence of events. Nor would the jury need to decide this question if we were to reverse and remand for trial. Instead, here the parties agree that Shawn's negligence caused a series of events which, by some mechanism, led to his death. Julie and the estate brought negligence claims based on the theory that the docked trailer's rusty landing legs also contributed to Shawn's death. Because Julie points to no summary judgment evidence—only speculation offered by Dr. Ziejewski and Bussard—in support of her theory that the landing legs collapsed because of the rust, she cannot prove proximate cause with respect to her negligence claim and summary judgment is proper. Potentially disputed issues of fact related to Dr. Dunn's testimony about the precise mechanism leading to Shawn's death are thus not genuine issues of *material* fact. *Wallace v. S. Ohio Med. Ctr.*, 4th Dist. Scioto No. 10CA3383, 2011-Ohio-3570, ¶ 25, citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505 (1986) (holding that substantive law identifies the material facts in a case and that "[n]ot every factual dispute precludes summary judgment. Rather, only disputes as to the *material* facts preclude summary judgment." [Emphasis sic.])

{¶83} We overrule Julie's first assignment of error.

## B. Assignment of Error No. 2:

{¶84} Julie's Assignment of Error No. 2 states:

{¶85} THE TRIAL COURT ERRED IN CONCLUDING THAT DEFENDANTS WERE NOT NEGLIGENT OR, ALTERNATIVELY, THAT THE NEGLIGENCE OF MR. DAVIS CLEARLY EXCEEDED DEFENDANTS' NEGLIGENCE.

{¶86} In support of Assignment of Error No. 2, Julie reiterates many of her arguments presented in support of Assignment of Error No. 1. To the extent Julie reiterates

her arguments, we have already addressed those arguments above with respect to Assignment of Error No. 1.

{¶87} That said, Julie does make two arguments in support of Assignment of Error No. 2 that she did not make with respect to Assignment of Error No. 1. First, Julie argues that the evidence, viewed in a light most favorable to her, proves that Royal and Beauty had a duty to ensure the structural integrity of the docked trailer's landing legs and breached that duty either by not inspecting the landing legs, or by not using a jack stand to provide the docked trailer with additional support. In other words, while Julie only addressed the proximate cause element of a negligence claim in her discussion of Assignment of Error No. 1, she now addresses the other two elements—duty and breach of duty—in her discussion of Assignment of Error No. 2. Second, Julie argues that the trial court erred when it found that even if Royal and Beauty were negligent, Shawn's negligence exceeded their negligence and therefore barred Julie's recovery.

{¶88} Even if we were to find, as Julie urges, that the trial court's holding about the duty and breach of duty elements of negligence was in error, our holding as to Assignment of Error No. 1—that is, that there is no genuine issue of material fact with respect to the proximate cause element of her negligence claims—would still require that we affirm the trial court's summary judgment decision. In other words, our holding as to proximate cause requires that we affirm the trial court's decision, whether or not the trial court was correct about duty and breach of duty. Julie's arguments about duty and breach of duty are moot, and we therefore decline to consider those arguments. *See Holcomb v. Holcomb*, 12th Dist. Clermont No CA2013-10-080, 2014-Ohio-3081, ¶ 28 (holding that defendant's failure to establish a material fact as to duty rendered any argument concerning proximate cause moot).

{¶89} Likewise, because we hold that there is no genuine issue of material fact and

Julie cannot prove the proximate cause element of her negligence claims, Julie's argument related to the trial court's comparative negligence holding is also moot and we need not consider the second assignment of error.

### III. Conclusion

{¶90} We hold that there is no genuine issue of material fact related to proximate cause and, as a result, the trial court properly granted Royal's and Beauty's motions for summary judgment. Julie's remaining arguments are moot.

{¶91} Judgment affirmed.

HENDRICKSON, J., concurs.

PIPER, P.J., dissents.

**PIPER, P.J., dissenting.**

{¶92} I respectfully dissent from an analysis of the summary judgment evidence that determines the sequence of events, as they unfolded, isn't significant in determining who is primarily responsible, and that expert opinions offered in summary judgment are not accorded equal consideration. Respectfully, I find it inappropriate to discredit the *nonmoving* party's experts without first analyzing the evidence the *moving* parties produced in meeting their initial burden. With no analysis or details my colleagues simply conclude the defendants' initial burden has been met. ¶ 73, 78, 81 above. Similarly, I disagree with the majority's determination that plaintiff does not dispute what caused Shawn's death. ¶ 63 above. With a battle of experts, and considering the evidence in favor of the nonmoving party, it is possible for plaintiff to prove causation of Shawn's death is *not* attributed to Shawn.

{¶93} Furthermore, I disagree with the judgment call that focuses only upon the

opinions of plaintiff's experts and determines both are mere speculation. The insinuation that the opinions of plaintiff's experts are meager and inconclusive is unwarranted. ¶ 72 above. If such an evaluation is due plaintiff's experts, then the same should be applied defendants' expert. The experts disagree as to who ultimately is responsible for Shawn's death. Since the opinions are based upon reviewing the same material (photographs, witness descriptions, depiction of physical evidence, etc.) one opinion cannot be given more weight than the other. Yet the defendants' expert is spared the microscope, where plaintiff's experts are not. This creates an unlevel playing field.

## A. CAUSATION

{¶94} I agree with my colleagues that normally causation is a question of fact to be determined by a jury. I fail to see why this is not the typical case of experts disagreeing. A genuine question exists as to whose negligence was the primary cause of Shawn's death— his own, Royal's, Beauty's, or some combination thereof? We must examine the physical evidence, *along with* the lay witness testimony, *in conjunction with* the experts' opinions. A jury must resolve factual issues to determine which expert more reasonably explains the cause of Shawn's death in order to determine who is primarily responsible.[6]

{¶95} Generally, the issue of causation is a question of fact "and cannot be resolved by means of summary judgment." *Arnett v. Mong,* 12th Dist. Fayette No. CA2015-10-022, 2016-Ohio-2893 ¶ 18. Furthermore, "[w]hether the intervening act or cause constituted a concurrent or superseding cause, and whether the intervening cause was reasonably foreseeable by the original party guilty of negligence, present questions for submission to a

---

6. The majority's summary review of the events acknowledges that although there was an initial low impact sideswipe, whether the fully loaded and docked trailer was somehow lifted, and if so how, is disputed by the experts. Also disputed is when Shawn exited his tractor, and when, in the sequence of events, the docked trailer collapsed. However, the reasoning of the majority concludes the expert opinions, although "competing" do not need to be considered because the details of how the events unfolded is unimportant and need not be determined. ¶ 72 above. Yet the parties disagree as to what caused the trailer to collapse.

jury which generally may not be resolved by summary judgment." *Cascone v. Herb Kay Co.*, 6 Ohio St.3d 155, paragraph two of the syllabus (1983). "[T]he totality of the causal negligence must be examined and is a question to be submitted to the jury whose duty it is to apportion negligence." *Case v. Norfolk & W. R. Co.*, 59 Ohio App.3d 11, 15 (6th Dist.1988). Summary judgment is not appropriate where there may be a question of fact as to whether the defendants' negligence may be greater than the negligent actions of the plaintiff. *Baldwin's Ohio Personal Injury,* Section 7:16 (2022 Ed.).

## B. DE NOVO REVIEW OF EXPERT OPINIONS

{¶96} Since a trial court's decision to grant summary judgment involves only a question of law, an appellate court conducts a de novo review and "stands in the shoes of the trial court." *Cooke v. Sisters of Mercy*, 12th Dist. Butler No. CA97-09-181, 1998 WL 221320, at *2 (May 4, 1998). A summary judgment analysis on a matter of law must not weigh the evidence or judge the credibility of witness testimony. "[W]here the parties present conflicting experts' opinion, the credibility of one expert opinion over another is not a proper determination in ruling on a summary judgment motion." *DiBlasi v. First Seventh-Day Adventist Community Church*, 11th Dist. Geauga No. 2013-G-3169, 2014-Ohio-2702, ¶ 32. When considering summary judgment motions, expert opinions are to be accepted as true. *Id. Sherritt v. Leath*, 5th Dist. Stark No. 2021 CA 00094, 2022-Ohio-2367, ¶ 37 (With expert opinions to be accepted as true, "conflicting expert opinions regarding the defendant's liability raise a genuine issue of material fact, precluding summary judgment").

## C. SUMMARY JUDGMENT SHIFTING BURDENS

{¶97} Importantly, as the moving parties, the defendants have the initial burden to produce evidentiary materials demonstrating the nonmoving party cannot produce evidence of causation. *Dresher v. Burt*, 75 Ohio St. 3d 280, 285 (1996). Only after the moving party meets its initial burden does the nonmoving party have a reciprocal burden to point to

contrary evidence which supports their claim. Therefore, any analysis must begin with examining the summary judgment material produced by the defendants, the parties moving for summary judgment.

### D. ANALYSIS

**{¶98}** The majority determines Shawn's estate points to no evidence of causation which can be attributed to defendants, and analyzes *the nonmovant's evidence* opposing summary judgment. ¶ 81-82 above. Notably, the same discussion is not first given to what evidence the moving parties point to. While referencing plaintiff's reciprocal burden as the nonmoving party, ¶ 63 above, the majority gives no analysis to *the defendants' evidence* offered in satisfying their initial burden as the moving party. There is no explanation as to what defendants "point to" to satisfy their initial burden demonstrating a reasonable jury could not possibly determine the sideswiped trailer should not have collapsed as it did.

**{¶99}** Similarly, the majority's analysis fails to acknowledge the eyewitness factual observations which support the opinions of Dr. Ziejewski, and the commercial transportation specialist, Bussard. Both attributed the inadequacy of the docked trailer's stabilization as a cause, offered reasonable opinions as to how the collapse occurred, and explained how they determined sequence of events that ultimately caused Shawn's death. While asserting it is not judging the credibility of the different experts and attributing weight to any particular expert, the majority finds plaintiff has failed to meet her *reciprocal* burden. However, it should have first determined whether the defendants met their *initial* burden.

**{¶100}** The majority scrutinizes the opinions of Dr. Ziejewski and Bussard. My colleagues conclude that both of plaintiff's experts have no merit as to causation because their opinions are "speculative". Yet while the conclusions of plaintiff's and defendants' experts are different, their respective opinions are premised upon review of the same evidence. There is no explanation why one is "speculative" and the other not.

**{¶101}** Noticeably, the same scrutiny is not given to Dr. Dunn's testimony which summarily concludes the docked trailer's stabilization was adequate and never left the ground. Dr. Dunn reaches his conclusions with *no* testing, *no* calculation of collision impact force, and instances of *equivocal opinion* like, "I think" the loaded docked trailer supports were still in place. Some of Dr. Dunn's conclusions actually contradict eyewitness perceptions of the events.

### 1. Defendants' Initial Summary Judgment Burden

**{¶102}** The defendants produced Dr. Dunn's testimony to support their theory as to causation. Defendants produced Dr. Dunn's testimony in support of their initial burden in moving for summary judgment. However, Dr. Dunn's testimony leaves many unanswered questions as to the chain of occurrences which caused Shawn's death. As expected, Dr. Dunn disagrees with plaintiff's experts which results in an often-observed battle of experts. Interestingly, Dr. Dunn's conclusions do not give significance to unfavorable eyewitness observations and to important circumstantial evidence from the scene. His testimony gives no explanation for this. It would appear to be either from oversight or because he finds such testimony not credible.

**{¶103}** For example, Dr. Dunn believes that Shawn was negligent in failing to thoroughly detach the empty trailer he was delivering. However, Dr. Dunn does not explain, despite Shawn's alleged initial negligence, why the trailer subsequently collapsed from a slight lateral impact. Dr. Dunn, not having the benefit of instructions of law, gives no application of concepts like intervening cause, superseding cause, or apportionment of negligence. Dr. Dunn's assumption is that such concepts are not applicable.

**{¶104}** Waymire's testimony indicates that after the sideswipe Patterson caused the

tractor to lurch forward several feet into the docked trailer.[7]  Patterson then backed the tractor releasing Shawn; afterwards the docked trailer collapsed.  Patterson acknowledges he reversed the tractor, unpinning Shawn, thereby permitting Shawn to fall to the ground.  Upon Shawn becoming unpinned, he fell to the ground because the docked trailer had not yet collapsed.  The question then remains—why did the fully loaded and already docked trailer subsequently collapse, particularly *if* its landing gear supports remained in place, as Dr. Dunn suggests?

{¶105} Dr. Dunn assumes it was the lurching of the tractor on its own volition that caused the docked trailer to eventually collapse but not because the trailer supports gave out.  This disputes eyewitness testimony that the docked trailer collapsed *after* Patterson backed the tractor up and *after* Shawn was unpinned and fell to the ground.  Dr. Dunn's opinion involves numerous assumptions such as Shawn attempting to back the tractor up, that the tractor lurched forward on its own, that Shawn left the tractor in reverse, and the tractor clutch disengaged itself.  None of these are inferences drawn from known facts; they are assumptions in the absence of evidence.

{¶106} Dr. Dunn indicates that the docked trailer supports never left the ground, yet gives no explanation founded in facts as to why the trailer collapsed.  In other words, Dr. Dunn does not address plaintiff's complaint that the landing gear supports were unsafe, had been inadequately inspected, failed due to their condition, and should have been reinforced with the use of temporary stabilizing jacks in the exercise of reasonable caution.  Dr. Dunn considers stabilizing jacks to be unnecessary because they are only recommended by OSHA, not mandated.  However, plaintiff did not argue it was negligence per se to not use

---

7. Dr. Dunn assumes the trailer lunged itself, with no driver, into the loaded docked trailer causing a "crash." But a jury could reasonably determine Shawn is not liable for Patterson lurching the tractor into the docked trailer, and beyond that, a reasonable jury could determine that a trailer with a safe support system would not have collapsed.

them, only that reasonable safety and due regard required their use.

{¶107} OSHA recommendations represent best practices – it is for a jury to determine if such best practices were warranted. A reasonable jury could find that a docked trailer, no longer attached to a tractor, fully loaded, and standing with its existing support system, could foreseeably undergo some lateral shifting and that using OSHA recommended temporary braces (reinforcing existing "landing gear" supports) would be prudent.

{¶108} The same tests plaintiff's experts are criticized for not performing, were also not performed by Dr. Dunn. Dr. Dunn's testimony does not explain whether the existing supports were adequate to absorb some limited amount of lateral movement or shifting, nor does he explain the cause of Shawn's death. Yet one expert is deemed speculative and the other is not. Dr. Dunn does, however, contend that the trailer supports are not designed to remain intact following a vehicle crash. Whether this was in fact a vehicular crash as Dr. Dunn describes it, or merely a low-speed sideswipe is something that falls within the province of a jury.[8]

### 2. Dueling Allegations

{¶109} Unfortunately, my colleagues find that a jury's resolution of the details is insignificant in determining causation. ¶ 82 above. Although plaintiff's experts suggest the docked trailer was susceptible to collapse due to its condition, the majority implies that the sole cause of Shawn's death was his failure to successfully unhitch his tractor from the trailer he was delivering and that everything which occurs thereafter is his liability. ¶ 60 above. Without articulating what is meant by "the accident," the majority's de novo review suggests it is undisputed Shawn is liable for the stationary docked trailer collapsing on top

---

8. Braces, as recommended by OSHA, are for stationary trailers and do not pertain to vehicular crashes. They are added for the purpose of detached stationary trailer stabilization, not for preventing damage in vehicular crashes.

of himself. ¶ 60 above. Simultaneously, and somewhat inconsistently, the majority finds the sequence of events is not material and the details don't need to be determined in their analysis.

{¶110} My de novo review determines the cause of Shawn's death is very much disputed. The defendants' summary judgment evidence does not meet their initial burden in demonstrating that as a matter of law, a reasonable jury could not believe the stationary, docked trailer was in an unsafe condition and shouldn't have collapsed on top of Shawn. The only way such a conclusion can be reached is if the defendants' allegations are believed and plaintiff's are not.

{¶111} While plaintiff's experts suggest rust was a contributing cause to the condition of the supports (not *the* cause) being unsafe, they are criticized for not having the metal supports scientifically tested as to strength. However, the *moving* party had no scientific tests performed and cannot say rust wasn't a factor contributing to metal fatigue. This leaves only dueling allegations which makes summary judgment inappropriate as a matter of law. One side says the docked trailer supports were inadequate and shouldn't have been without support braces. The other side says support braces weren't necessary suggesting the docked trailer supports were intact and never left the ground.

{¶112} Despite the suggestions of Dr. Dunn's testimony, we know from an eyewitness account that the docked trailer only collapsed *after* Patterson backed the trailer up. No one indicated the docked trailer collapsed simultaneously as the tractor backed up (not even Dr. Dunn). If the docked trailer would have collapsed simultaneously with Patterson backing up the tractor, Shawn would have remained pinned and unable to freely fall to the ground as the witnesses described. In other words, there was no testimony that Shawn stayed pinned the entire time and continued to be crushed by the docked trailer as the tractor backed up. The facts from eyewitnesses severely undermine Dr. Dunn's assumptions.

{¶113} As a way of discrediting the opinions of plaintiff's experts, the majority finds plaintiff's expert opinions are "speculative." ¶ 17, 22, 23, 26 above. I adamantly disagree. Cases such as these are almost always proved, or disproved, with the use of circumstantial evidence and inferences—which inferences should be deemed reasonable is a jury determination. Both experts made inferences based upon their respective expertise and from factual assessments derived from the evidence. If not considering plaintiff's experts, then defendants' expert should not be considered either. If neither set of experts are considered, we are left with just dueling allegations and summary judgment must not be entered for either. *Dresher v. Burt*, 75 Ohio St. 3d 280, 285 (1996).

### 3. Battle of the Experts

{¶114} Characterizing inferences as "speculative" is a roundabout way of judging the weight or credibility of the reasonableness of the inferences. In deciding a summary judgment motion, an appellate court standing in the shoes of the trial court may not weigh or assess the credibility of the evidence. *DiBlasi*, 2014-Ohio-270 at ¶ 32; *Sherritt*, 2022-Ohio-2367 at ¶ 37. "Even the inferences to be drawn from the underlying facts * * * must be construed in the nonmoving party's favor." *Turner v. Turner*, 67 Ohio St.3d 337, 341 (1993).

{¶115} In *Walker v. Ford Motor Co.*, 8th Dist. Cuyahoga No. 100759, 2014-Ohio-4208, ¶ 30-36, appellate review rejected arguments that an expert's opinion fell into the realm of speculation and conjecture. The court noted that expert disagreements are simply part and parcel of a battle of experts and "go to credibility of, and the weight to be given, an expert's opinions, rather than their admissibility." *Id.* at ¶ 35. The court in *Walker* concluded that reasonable minds could have reached more than one conclusion and that judgment as a matter of law was inappropriate. *Id.* at ¶ 49. The majority's conclusion as to the state of the evidence may be the same as a jury's conclusion, however, it is not the only conclusion

that a reasonable jury could reach if considering all of the available evidence.

**{¶116}** Basically, Dr. Dunn believes something other than the inadequacy of the docked trailer's support system caused the trailer to collapse. Yet, Dr. Dunn's criticism of plaintiff's expert opinions is nothing more than a suggestion of disagreement. Dr. Dunn's different characterizations and conclusions do not demonstrate the absence of a genuine issue of material fact as to causation. Dr. Dunn merely suggests that since Shawn initiated the initial event, he is responsible for everything that follows in the sequence of events. However, we know the law does not operate the same in every case because the law is applied uniquely to different facts and circumstances. Dr. Dunn's suggestion alone does not meet defendants' initial burden, as the moving parties, to present evidentiary materials demonstrating that the nonmovant, plaintiff, has no evidence capable of proving the essential element of causation. *Dresher v. Burt*, 75 Ohio St. 3d at 285.

**{¶117}** But even though plaintiff had no reciprocal burden as the nonmoving party to disprove Dr. Dunn's assumptions, plaintiff *did* reciprocate with sufficient opposing evidentiary material. The eyewitness testimony, combined with the assessment of physical evidence incorporated into the expert opinions, demonstrates evidentiary support of causation. For example, Bussard testified to a reasonable degree of certainty a new trailer would not have collapsed. A reasonable jury could infer a used trailer properly maintained and adequately inspected for safety would not have collapsed from the impact. Bussard expounded that if collapsing due to the force of the impact, the trailer would fall in the opposite direction of the impact, not toward the direction of a forceful impact. Bussard's commonsensical reasoning would permit a reasonable jury to conclude Dr. Dunn's opinion has failed to consider significant factors.

**{¶118}** In *Estate of Hall v. Akron Gen. Med. Ctr.*, 125 Ohio St.3d 300, 2010-Ohio-1041, the court indicated "this case represents the classic battle between expert witnesses"

and the trier of fact must weigh the evidence and decide which expert to believe. *Id.* at 308. Where the summary judgment proceedings dispute who is the correct party responsible for causing the injury, issues of credibility must be decided by the jury. *Carter v. Vivyan*, 10th Dist. Franklin No. 11AP-1037, 2012-Ohio-3652, ¶ 21 (plaintiff only needed to present evidence demonstrating a genuine issue of material fact regarding the proximate cause of injury). Where the purpose of summary judgment is to filter out claims that cannot succeed at trial (as a matter of law) it is error for the trial court to conclude the expert opinion was not sufficient to survive summary judgment. *Roberts v. Fraiser*, 2d Dist. Montgomery No. 20989, 2006-Ohio-312, ¶ 13, 30 (proximate cause was a pivotal question and the nonmoving party could rely on the opposing party's expert opinion.) [9]

## E. CONCLUSION

{¶119} At this stage of the proceedings, it is difficult to conclusively determine the actual sequence of events. The sequence of events is material because it aids an understanding of the step-by-step occurrences coming together to create the incident that ultimately occurred—Shawn's death. The value of an expert opinion is founded upon the validity of the facts and circumstances incorporated therein and ultimately believed by the finder of fact. The difficulty in unraveling which facts and circumstances are to be believed and which experts are believable, lies best in the hands of a jury, not dismissed by way of summary judgment.

{¶120} With the facts and circumstances demonstrated within the record, there is a viable claim that the unattached, fully loaded stationary trailer wasn't adequately inspected, existed in an unsafe condition, and should have been temporarily braced to prevent

---

9. The battle of experts is often found in other aspects of negligence claims other than those dealing with proximate cause. Opposing experts with differing opinions as to whether the standard of care was breached falls within the province of the trier of fact to weigh. *Gysegem v. Ohio State Univ. Wexner Med. Ctr.*, 10th Dist. Franklin No. 20AP-477, 2021-Ohio-4496, ¶ 74.

collapse due to minimal impact. Despite Dr. Dunn's insinuation to the contrary, a slow speed lateral sideswipe, or impact, would not reasonably be expected to cause a trailer to topple over, particularly in the direction of the sideswipe or impact. Furthermore, if a jury believed Shawn acted negligently in detaching his empty trailer from his tractor, only a jury can evaluate and apportion the degree of his liability.

{¶121} In a case such as this one, we are best reminded summary judgment is to be used with caution resolving all doubts in favor of the nonmoving party. This is because it precludes the nonmovant's access to a jury's determination upon a full presentation of the evidence for resolution of disputed issues. *State ex rel. Yost v. Settlers Walk Home Owners Assn.*, 12th Dist. Warren No. CA2021-11-102, 2022-Ohio-3106, ¶ 24. Due to the nature of summary judgment as a truncated proceeding, Ohio courts have routinely determined it must be used "sparingly." *Id.*

{¶122} Summary judgment is only appropriate upon a "tripartite demonstration," where: (1) there is no genuine issue as to any material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) that reasonable minds can come to only one conclusion, and that conclusion is adverse to the nonmoving party who is entitled to have the evidence construed most strongly in their favor of not having summary judgment awarded against them. *Cooke*, 1998 WL 221320 at *2, citing Civ. R. 56(E) and *Harless v. Willis Day Warehousing Co.*, 54 Ohio St.2d 64, 66 (1978). The significance of that "tripartite demonstration" has not been meaningfully applied in the granting of summary judgement to defendants. In finding plaintiff has no evidence going to proximate cause, my concern is for a decision which invades the province of a jury (regarding a question of fact) and denies the plaintiff a full presentation of evidence.

{¶123} Therefore, I respectfully dissent from my colleagues deciding as a matter of law, the plaintiff cannot prove causation attributed to the defendants. One expert opinion

cannot be given more weight or credibility than another. If neither set of experts is to be considered, then we are left with dueling allegations and summary judgment is inappropriate. In regard to the trailer collapsing, what caused it, and who is responsible for it — is clearly material, clearly disputed, and only to be revealed by determining the sequence of the events that led to Shawn's death.

{¶124} I also do not find the second assignment of error as to comparative negligence moot. Plaintiff's arguments as to comparative negligence, duty and breach of duty are well taken for much of the same reasons as expressed herein addressing the first assignment of error. Let the experts defend their respective opinions in open court before a jury. I find plaintiff's assignments of error well taken and would reverse the trial court judgment awarding summary judgment to the defendants.